No. 23-2359

# In the
# United States Court of Appeals for the Eighth Circuit

DARRIN S. RICK,
*Petitioner-Appellee,*

v.

JODI HARPSTEAD, COMMISSIONER, MINNESOTA DEPARTMENT OF HUMAN SERVICES,
*Respondent-Appellant.*

**On Appeal from the United States District Court for the
District of Minnesota, No. 19-cv-02827-NEB**

**BRIEF OF APPELLEE DARRIN S. RICK**

LANCE R. HEISLER #043631
105 East 5th Street, Suite 205
Northfield, MN 55057
Phone: (507) 222-9062
lheisler@heislerlawoffice.com

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF THE CASE ............................................................................. 1

SUMMARY OF ARGUMENT ............................................................................ 4

ARGUMENT ...................................................................................................... 5

I.    THE COURT SHOULD AFFIRM THE FEDERAL DISTRICT COURT AND EXTEND THE ACTUAL INNOCENCE/ MISCARRIAGE OF JUSTICE EXCEPTION TO THIS CIVIL COMMITMENT CASE .............. 5

    A. Standard of Review and Applicable Law ................................................. 5

    B. Rick Has Raised an Actual Innocence Claim Based on a Constitutional Due Process Violation ................................................................................ 8

    C. The Actual Innocence Exception/Fundamental Exception Should Be Applied to Civil Commitments ............................................................... 12

II.    THE COURT SHOULD AFFIRM THE CONCLUSION OF THE DISTRICT COURT THAT IN LIGHT OF NEW RELIABLE EVIDENCE IT IS MORE LIKELY THAN NOT THAT NO REASONABLE JURIST WOULD HAVE ORDERED RICK'S CIVIL COMMITMENT ................................................................................... 20

    A. Standard of Review and Applicable Law ............................................... 20

    B. The District Court Properly Concluded That New Reliable Evidence Established that The Most Significant Evidence That Led To Rick's Commitment Was Fundamentally Flawed, Which Rendered His Commitment Proceeding Fundamentally Unfair ..................................... 23

III.    THE COURT SHOULD AFFIRM THE DISTRICT COURT'S CONCLUSION THAT THERE WAS A VIOLATION OF RICK'S DUE PROCESS RIGHTS ................................................................................ 40

    A. Standard of Review and Applicable Law ............................................... 40

i

B. This Court Should Affirm the Conclusion of the District Court that Rick Has Established a Constitutional Violation of His Right To Due Process ...................................................................................42

C. The District Court Has No Authority To Devise Or Implement Or Supervise A Release Plan For Rick .........................................................47

CONCLUSION ........................................................................................48

CERTIFICATE OF COMPLIANCE .......................................................50

CERTIFICATE OF SERVICE ................................................................51

Appellate Case: 23-2359    Page: 3    Date Filed: 09/29/2023 Entry ID: 5321070

# TABLE OF AUTHORITIES

**Cases**

*Albrecht v. Horn*,
   485 F.3d 103 (3d Cir. 2007) ...............................................................8

*Amrine v. Bowersox*,
   238 F.3d 1023 (8th Cir. 2001) ...........................................................36

*Anderson v. City of Bessemer City*,
   470 U.S. 564, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) ....................22

*Beaulieu v. Minnesota*,
   No. 06-CV-4764 JMR/JSM, 2007 WL 2915077 (D. Minn. Oct. 4, 2007) ......5, 13

*Chancery Clerk of Chickasaw County v. Wallace*,
   646 F.2d 151 (5th Cir. 1981) ..............................................................14

*Dowling v. United States*,
   493 U.S. 342, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990) ....................11

*Duncan v. Wacher*,
   533 U.S. 167 (2001) .............................................................................5

*Estelle v. McGuire*,
   502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) ......................11

*Fay v. Noia*,
   372 U.S. 391, 83 S. Ct. 822, 9 L.Ed. 2d 837 (1963) .........................5, 7

*Feather v. United States*,
   19 F.4th 982 (8th Cir. 2021) ...............................................................10

*Foucha v. Louisiana*,
   504 U.S. 71, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992) .............. 40, 41

*Gabaree v. Steele*,
   792 F.3d 991 (8th Cir. 2015). ...............................................................6

iii

*Gimenez v. Ochoa*,
   821 F. 3d 1136 (9th Cir. 2016) ................................................................ 10, 11, 29

*House v. Bell*,
   547 U.S. 518, 126 S. Ct. 2064 (2006) ........................................................ 22, 23

*In re Benson*,
   2003 WL 139397 (Minn. Ct. App. Jan. 21, 2003) .............................................14

*In re Civil Commitment of Lonergan*,
   811 N.W.2d 635 (Minn. 2012) ...................................................................15

*In re Ince*,
   847 N.W.2d 13 (Minn. 2014) ........................................................ 25, 27, 34, 46

*In re Linehan* (Linehan I),
   518.N.W.2d 609 (Minn.1994) ........................................................ 23, 24, 25

*In re Linehan* (Linehan III),
   557 N.W.2d 171 (Minn. 1996) ...................................................................10

*In the Matter of Monson*,
   478 N.S.2d 785 (Minn. Ct. App 1991) ........................................................24

*In the Matter of Pirkl*,
   531 N.W. 2d 902 (Minn. 1995) ...................................................................27

*Jones v. United States*,
   463 U.S. 354, 103 S. Ct. 3043, 77 L. Ed 2d 694 (1983) ......................................41

*Kansas v. Hendricks*,
   521 U.S. 346, 117 S. Ct. 2072, 138 L. Ed. 2d. 501 (1997) .................................. 41

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1998) ....................................20

*Kealohapauole v. Shimoda*,
   800 F.2d 1463 (9th Cir. 1986) ...................................................................11

iv

*Lee v. Houtzdale,*
798 F.3d 159 (3d Cir. 2015) ............................................................44

*Lewis v. Erickson,*
946 F.2d 1361 (8th Cir. 1991) .........................................................36

*McKinney v. Rees,*
993 F.2d 1378 (9th Cir. 1993) ..........................................................11

*McQuiggin v. Perkins,*
569 U.S. 383 (2013) ....................................................................5, 21

*Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.,*
190 F.3d 64 (2d Cir. 1999) ..........................................................23, 35

*Murray v. Carrier,*
477 U.S. 478, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986) .......................8

*Nooner v. Hobbs,*
689 F.3d 921 (8th Cir. 2012) ..........................................................31

*Rhodes v. Smith,*
950 F.3d 1032 (8th Cir. 2020) .........................................................10

*Rousan v. Roper,*
436 F.3d 951 (8th Cir. 2006) ..........................................................40

*Sanders v. Sullivan,*
863 F.2d 218 (2d Cir. 1988) ............................................................46

*Santos v. Thomas,*
779 F.3d 1021 (9th Cir. 2015) .........................................................36

*Schlup v. Delo,*
513 U.S. 298, 115 S. Ct. 851 (1995) ................................................23

*Schmidt v. McCulloch,*
823 F.3d 1135 (7th Cir. 2016) .........................................................13

v

*Shannon v. Minnesota Department of Corrections*,
   No. 18-CV-636 WMW/LIB, 2019 WL 3325384 (D. Minn. June 4, 2019) .........13

*Souliotes v. Hedgpeth*,
   No. 1:06-cv-00667 AWI/MJS HC 2012 WL 1458087
   (ED Calif. Apr. 26, 2012) ...................................................................................44

*United States v. United States Gypsum Co.*,
   333 U.S. 364, 68 S. Ct. 525, 92 L. Ed. 746 (1948) ..................................... 22, 23

*Unites States v. Chapell*,
   779 F.3d 872 (8th Cir. 2015) ............................................................................22

*United States ex rel. Smith v. Baldi*,
   344 U.S. 561, 73 S. Ct. 391, 97 L.Ed. 549 (1953) ...............................................5

*Weeks v. Bowersox*,
   119 F.3d 1342 (8th Cir. 1997) .............................................................................7

## Statutes

28 U.S.C. § 2254 ......................................................................................................6, 27

Minn. Stat. §243.166 Subd. 6(d)(4) .........................................................................15

Minn. Stat. § 253D.31 ...............................................................................................15

## Rules

FRCP 52(a) ...............................................................................................................22

vi

## STATEMENT OF THE CASE

Rick was born on June 12, 1967. Rick has a high school education and an employment history that includes work as a telecommunications analyst. (Pet. Exh. 1 at 3 ¶ 8). He has no juvenile record. He does not have any history of alcohol or chemical abuse. (*Id*. at 3 ¶ 9). On December 13, 1993 Rick pled guilty to four counts of criminal sexual conduct. While on bail, he did not reoffend, nor did he violate any of the terms of his conditional release. (*Id*. at 4 ¶ 14).

While in state prison, Rick participated in the sex offender treatment program for sixteen months, from May 7, 2001 until September 9, 2002; at that time Rick withdrew from the treatment program. (*Id*. at 6 ¶ 19), At the conclusion of Rick's prison confinement, he was assigned risk level 3 by the Department of Corrections. However, Penny Zwecker, on behalf of the civil commitment review committee, determined that Rick was a moderate risk for recidivism, and did not recommend him for civil commitment. (*Id*. at 10 ¶ 30). Despite the lack of referral for commitment, the County began civil commitment proceedings seeking to commit Rick as both a Sexual Psychopathic Personality (SPP) and a Sexually Dangerous Person (SDP).

The State court appointed two forensic psychologists to evaluate Rick. The County hired an additional forensic psychologist evaluate Rick. All three evaluators applied the PCL-R2 psychopathic checklists to assist in determining

1

whether Rick met the criteria as a SPP (sexual psychopathic personality). His scores were 9,10, and 13 – well below the score of 30 required for placement in the psychopathic category. All three evaluators concluded that Rick did not meet the criteria as a SPP. (Pet. Exh. 3 at 8; Pet. Exh. 5 at 19; Pet. Exh. 9 at 8). All three evaluators did conclude that Rick met the criteria as a SDP (Pet. Exh. 3 at 11; Pet. Exh. 5 at 27; Pet. Exh. 9 at 16).

The two court appointed evaluators and the State court concluded that Rick could be safely treated in the community (Pet. Exh. 1 at 18; Pet. Exh. 3 at 11; Pet. Exh. 5 at 27). The County evaluator opined that Rick need to be treated in confinement at the MSOP (Minnesota Sex Offender Program) (Pet. Exh. 9 at 16).

Rick established by clear and convincing evidence that his treatment needs could be met in an outpatient community-based program (Pet. Exh. 2 at 9 ¶ 2). The State court determined that Rick's treatment needs required a program of at least 9 months. (Pet. Exh. 2 at 8 ¶ 32). However, although there was no statutory prohibition that precluded the DOC from funding Rick's stay at the halfway house for 9 months, the DOC approved funding for only 60 days. (*Id*. ¶¶ 29 & 30). Rick had private funding available to pay for the full term of his outpatient treatment, but the halfway house providers were not willing to accept Rick as a "private pay" client. (*Id*. at 7 ¶¶ 26 & 29).  As a result, the State court ruled that Rick was not able to prove "through no failure of his own" that a less restrictive alternative was

2

"presently available" and therefore Rick was committed for an indeterminate term to the MSOP. (Pet. Exh. 2 at 9-10).

After exhausting his state remedies, Rick filed a petition for habeas relief, which was subsequently amended to raise the sole ground that reliable new evidence undermined and discredited critical risk assessment tools and clinical assumptions upon which his judgment of commitment was based and which rendered his initial commitment a fundamental miscarriage of justice. (App. 1-14, R. Doc. 1; App. 264-74, R. Doc. 45, at 3-4).

**NOTE**: Rick is satisfied with the portion of Appellant's Statement of the Case on pages 4, and 9-14, and so will not repeat that portion of the Appellant's statement here.

Appellate Case: 23-2359    Page: 10    Date Filed: 09/29/2023 Entry ID: 5321070

## SUMMARY OF ARGUMENT

The district court has demonstrated in this case that the actual innocence/fundamental miscarriage exception can be applied to civil commitments while upholding the same rigorous standards that apply in the criminal context.

Civil commitments require a prediction that a person who has committed no new crime will reoffend in the future. It is a bright line constitutional requirement that no one can be deprived liberty without proof of dangerousness.

The evidence in this case shows that the science and research applicable to predictions of future harm are constantly changing. Opinions by experts based on outdated research regarding recidivism rates and other factors indicative of recidivism can result in predictions so flawed that they fatally infect the entire commitment proceeding. This is true especially in the close and extraordinary case where the evidence identified by the state court as most important is the very evidence that is substantially undermined by the new and reliable evidence.

In this case, the new evidence not available at the time of Rick's commitment trial, rendered the evidence upon which Rick's commitment was based so flawed that both court appointed expert evaluators recanted their previous conclusions and determined that Rick should not have been committed in 2004.

The order of the district court applying the actual innocence/fundamental miscarriage of justice exception to this case should be affirmed.

4

**ARGUMENT**

I. **THE COURT SHOULD AFFIRM THE FEDERAL DISTRICT COURT AND EXTEND THE ACTUAL INNOCENCE/ MISCARRIAGE OF JUSTICE EXCEPTION TO THIS CIVIL COMMITMENT CASE.**

> "The natural extension to a civil commitment proceeding would be that the exception is available upon a showing, based on new evidence, that a constitutional violation has probably resulted in Petitioner being classified as a SDP or SPP." (*Beaulieu v. Minnesota*, NO. 06-CV-4764, 1007 WL 2915077 N.#4 (D. Minn. Oct. 4, 2007).

### A. Standard of Review and Applicable Law

The U.S. Supreme Court has established the general principle that persons in custody as a result of a state's civil commitment process may challenge the constitutionality of their custody through the writ of habeas corpus *Duncan v. Wacher*, 533 U.S. 167, 176 (2001). The US Supreme Court has affirmed that a habeas action is one in equity, and thus equity is the overriding principle which governs a habeas action. (*Fay v. Noia,* 372 U.S. 391, 438, 83 S. Ct. 822, 848, 9 L.Ed. 2d 837 (1963), citing *United States ex rel. Smith v. Baldi,* 344 U.S. 561, 573, 73 S. Ct. 391, 397, 97 L.Ed. 549 (1953).

In *McQuiggin*, the court emphasized that the actual innocence exception allows courts to ensure "that federal constitutional errors do not result in *the incarceration of innocent persons.* (*McQuiggin v. Perkins*, 569 U.S. 383, 400 (2013) (emphasis added). As Magistrate Judge Schultz opined in this case, "the

5

justification for the existence of the gateway innocence exception—or its application--is no less compelling if a person's unconstitutional custody resulted from a civil rather than a criminal process" (R. Doc. 53, at 17, Schultz R&R). The central element in both contexts is the fact of incarceration and loss of liberty.

In this case the district court has determined, based on a *de novo* review of the entire record, that "it is more likely than not that, considering the new reliable evidence. . . no reasonable jurist would have found by clear and convincing evidence that Rick met the standard for commitment" (R. Doc. 125, at 31-32, Add. 031-032) and further "Rick has shown that the alleged improprieties were so egregious that they fatally infected his commitment proceeding and rendered the proceeding fundamentally unfair" (R. Doc. 125, at 32, Add. 032). Having met the full criteria for application of the actual innocence/miscarriage of justice exception, the district court granted Rick's habeas petition.

The County correctly notes the standard of review which governs this court on appeal, stating that a *de novo* review applies to the district court's conclusions of law, but factual findings will not be overturned except for "clear error" (citing *Gabaree v. Steele*, 792 F.3d 991, 996 (8th Cir. 2015). This court must also presume that the State court's factual determinations are correct. (28 U.S.C. § 2254(e)(1). The County in this case concedes that the state trial court in Rick's trial properly considered the evidence and factors presented (Cty. Brief, p. 34).

6

The County argues, citing *Weeks v. Bowersox*, 119 F.3d 1342, 1351 (8th Cir. 1997), that the district court paid insufficient deference to comity and finality interests in extending this exception to a civil commitment case. However, as the Supreme Court noted in *Noia*, "conventional notions of finality . . . cannot be permitted to defeat the manifest federal policy that federal constitutional rights of personal liberty shall not be denied without the fullest opportunity for plenary federal judicial review (*Noia*, 372 U.S. at 860).

The principles of finality and comity do not preclude application of the actual innocence exception in the criminal context. Indefinite and potentially permanent loss of individual liberty and the protections afforded by the due process clause are at stake in both the criminal and civil commitment contexts. Accordingly, the principles of comity and finality should not preclude application of this exception to civil commitments.

The loss of liberty in this case is the same as the loss in a criminal case. If locking up an innocent person in prison merits an exception to the statute of limitations, then so does locking up a non-dangerous person in a building that is, but for the sign on the door, a prison. The key is that in both situations, the individual could not, consistent with the constitution, have been locked up. In neither case is the problem simply a procedural error.

7

## B. Rick Has Raised an Actual Innocence Claim Based on a Constitutional Due Process Violation

The County argues Rick's claim should be viewed as a freestanding claim of innocence because Rick "has not sufficiently raised an actual due process claim" (Cty. Brief p. 18 n.9). This assertion is both factually and legally incorrect. In support of its argument that Rick's claim is one of freestanding innocence, the County notes that Rick is not innocent, as he has been convicted of his crimes in criminal court (Cty. Brief p. 20). This entirely misses the point. To put in its barest logical form: as guilt is to imprisonment, dangerousness is to civil confinement. This is a case of "actual non-dangerousness," a condition that just as surely negates confinement as actual innocence.

The court's comments in *Albrecht v. Horn*, 485 F.3d 103, 124 n.7 (3d Cir. 2007) are directly on point. In that case, the court stated that a petitioner may claim that scientific evidence introduced at trial violated his due process rights if he could show that the evidence "infected his entire trial with error of constitutional dimensions". "***Such a petition for relief is not a free-standing innocence claim, but a due process claim***" (citing *Murray v. Carrier*, 477 U.S. 478, 494, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986) in which Justice Stevens notes " a constitutional claim that implicates 'fundamental fairness' . . . compels review regardless of possible procedural defaults," (emphasis added)).

8

Rick's constitutional claim, therefore, alleges a **substantive** due process violation, which is established when the fundamental fairness of the entire proceeding has been undermined by new and reliable evidence. The district court concluded that Rick met his burden by proving that "***the alleged improprieties were so egregious that they fatally infected his commitment proceeding and rendered the proceeding fundamentally unfair***" (R. Doc. 125 at 32, Add. 032) (emphasis added). Thus the constitutional due process violation has been established.

As noted above, the standard in both the criminal and civil contexts is whether new and reliable evidence has rendered the trial fundamentally unfair such that it is more likely than not that no reasonable fact finder would have convicted/committed the petitioner. However, a slight modification of the language to fit the civil commitment case is required.

The standard in the criminal context is proof of guilt beyond a reasonable doubt. The standard in civil commitments is whether there is clear and convincing evidence that the petitioner is "highly likely" to commit a sexual offense in the future. In the civil commitment process, the fact finder is the judge, rather than a jury. Nonetheless, the analysis in both contexts is the same, i.e., whether it is more likely than not that, considering the new reliable evidence, no reasonable jurist would have found by clear and convincing evidence that Rick met the standard for

9

commitment. This is the standard correctly applied by the district court to the facts in this case (*see* R. Doc. 125 at 32, Add. 031-032).

Civil commitments involve proceedings following release from incarceration in which the state petitions for continued, ***indeterminate*** confinement of the person despite the fact that he has satisfied the full penalty for his crimes and no new crime has been alleged. Confinement cannot occur unless it is proven by clear and convincing evidence that the person is dangerous, defined by the Minnesota Supreme Court as "highly likely" to commit a sexual offense ***in the future.*** (*In re Linehan* (*Linehan III*), 557 N.W.2d 171, 180 (Minn. 1996)). Given what is at stake, the need for the availability of this miscarriage of justice exception in the civil commitment context is great.

The County argues that the 8th Circuit Court has not decided whether a decision based on false or discredited scientific evidence violates the subject's right to due process (App. Brief p. 21). However, the County cites two cases in which this court *assumes* that a conviction based on such evidence *would* violate due process rights (citing *Feather v. United States*, 19 F.4th 982 (8th Cir. 2021) and *Rhodes v. Smith*, 950 F.3d 1032, 1036 n.2 (8th Cir. 2020)).

More importantly, a number of courts have determined that false or discredited scientific information does in fact constitute a solid basis for finding a due process violation (*see Gimenez v. Ochoa*, 821 F. 3d 1136, 1143-44 (9th Cir.

10

2016) which contains the following recital by the court: "The courts have long considered arguments that the introduction of faulty evidence violates a petitioner's due process right to a fundamentally fair trial—even if that evidence does not specifically qualify as "false testimony." (Citing *Estelle v. McGuire*, 502 U.S. 62, 68-70, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991); *Dowling v. United States*, 493 U.S. 342, 352-53, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990); *McKinney v. Rees*, 993 F.2d 1378, 1385 (9th Cir. 1993); *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465-66 (9th Cir. 1986). "Indeed, recognizing such a claim is *essential* in an age where forensics that were once considered unassailable are subject to serious doubt. . .  After all, ***flawed analytical methods may not be debunked until well after the expiration of a petitioner's one-year deadline to file a habeas petition under the AEDPA***" (emphasis added).

This reasoning in *Gimenez* is sound and is directly on point with regard to Rick's claim with regard to flawed scientific evidence in this case. The case for finding a due process violation is even more compelling in the context of the application of the miscarriage of justice exception where new evidence substantially undermines the most significant evidence which led to the determination that the person is dangerous and must be locked up.

11

## C. The Actual Innocence Exception/Fundamental Exception Should Be Applied to Civil Commitments.

The actual innocence/fundamental miscarriage of justice exception can and should be applied to civil commitments. Rick's case clearly demonstrates that in the area of civil commitments of sex offenders, evolving research has debunked many commonly held assumptions about what factors significantly impact future recidivism. For example, Dr. Phenix testified that factors such as avoidant personality disorder, lack of victim empathy, lack of insight into offending, and negative attitude, all of which were once considered factors that suggested an increased risk of recidivism, have all been debunked by subsequent research as having little if any impact on sexual recidivism (App. 389-390; 393, R. Doc. 88, at 41-42, 45).

The County argues that the court should avoid application of the miscarriage of justice exception to civil commitment cases because it would be "difficult" and "simply unworkable" (App. brief pp. 23, 26). This assertion by the County is puzzling. The County offers no clear argument as to why or how application of this exception to civil commitments would be any more difficult or unworkable than in the criminal proceeding. On the contrary, two jurists in Rick's case have clearly demonstrated that application of this exception to civil commitments can be applied to civil commitments applying the same standards that apply to the criminal proceeding.

12

In making its argument against application of this exception to civil commitments, the County cites to a case where yet another court has *assumed* that this exception *would* apply. (*See* Cty Brief at p. 25, citing *Schmidt v. McCulloch*, 823 F.3d 1135 (7th Cir. 2016). The County also points to the Minnesota district court case of *Shannon v. Minnesota Department of Corrections*, No. 18-CV-636 WMW/LIB, 2019 WL 3325384 (D. Minn. June 4, 2019), *report and recommendation adopted*, 2019 WL 3322918 (D. Minn. July 24, 20219) (R. Doc. 58 at n. 10), arguing that the analysis by the district court "actually hinders the district court's application of this exception to Rick's case" (Cty. Brief p. 25).

The County's argument is misplaced. The *Shannon* case has no relevance to the issues in this case. The petitioner in *Shannon* made no allegation that his commitment was unconstitutional, nor that his civil commitment trial was in any way a rare or extraordinary case. Since the petitioner in *Shannon* did not challenge the factual or legal basis for his civil commitment, the question of whether the actual innocence exception might apply to civil commitments was clearly not before the court, even on a hypothetical basis.

The County references *Beaulieu v. Minnesota*, No. 06-CV-4764 JMR/JSM, 2007 WL 2915077, at 3-5 (D. Minn. Oct. 4, 2007), the Minnesota district court case referenced at the beginning of this brief. The County correctly points out that the *Beaulieu* case is not binding authority. Still, the district court's comment that

13

extending the applicability of the actual innocence exception to civil commitments would be the "*natural extension*" of that remedy is sound reasoning.

 As Rick notes throughout this brief, the principles and standards that currently apply to the actual innocence exception in the criminal case can and should be applied to civil commitment cases where new reliable evidence demonstrates that there has occurred a constitutional violation of the right to due process, resulting in wrongful confinement.

The County argues that this exception should not be applied to civil commitments because the committed person is subject to re-evaluation and there is a statutory process available for the confined person to seek release. The County cites *Chancery Clerk of Chickasaw County v. Wallace,* 646 F.2d 151, 157 (5th Cir. 1981) in support of this argument.  This argument has no merit.

In the July 24, 2020 Report and Recommendation & Order of Magistrate Judge Schultz in this case the court notes as follows:

> "**Harpstead acknowledges Rick could not present to the judicial appeal panel the precise claim he makes in Ground One because both the panel and the Minnesota Court of Appeals have held that the panel's jurisdiction does not include challenges to the original commitment**" (Doc. 34 at 8, citing *In re Benson*, 2003 WL 139397 at*3 (Minn. Ct. App. Jan. 21, 2003).

Simply put, the statutory release process does not allow for a collateral attack on the original commitment proceeding.

Appellate Case: 23-2359     Page: 21     Date Filed: 09/29/2023 Entry ID: 5321070

If a person is involuntarily confined based on evidence so flawed as to constitute a violation of his due process rights, as two jurists have concluded in Rick's case, then confinement for *any* period of time is unlawful, regardless of what remedy might be available for release at some unspecified time in the future.

The statutory discharge process is the *exclusive* remedy in Minnesota for committed sex offenders seeking a transfer or discharge from commitment. (*In re Civil Commitment of Lonergan*, 811 N.W.2d 635, 642 (Minn. 2012)). This means that if new and exculpatory evidence becomes available after the initial commitment, and the habeas one year statute of limitations is missed, there is currently no remedy for that person to challenge an unconstitutional commitment based on that new exculpatory evidence.

Further, the statutory release process does not remedy the future harm associated with civil commitment. For example, being civilly committed in Minnesota as a sex offender triggers mandatory lifetime sex offender registration for the person committed. (*See* Minn. Stat. §243.166 Subd. 6(d)(4). Further, the statutory discharge criteria requires proof that the person is "no longer dangerous" – a conundrum if the person was not dangerous at the time of his commitment. (Minn. Stat. § 253D.31).

Appellate Case: 23-2359    Page: 22    Date Filed: 09/29/2023 Entry ID: 5321070

All of the foregoing illustrates why it is important and just to make this exception available to this civilly committed population group, and Rick strongly encourages this court to do so.

Finally, the County correctly points out that when applied, this exception must be limited to the "extraordinary" case (Cty. Brief at 28). The County simply declares that this is not such a case, but offers no explanation for that conclusion. Significantly, two jurists in this case each reviewed the record *de novo* and both correctly concluded that this *is* such a case. There is substantial support for that conclusion in the record, summarized in part as follows:

1. All three forensic psychologist evaluators agreed that Rick's commitment trial presented a very close case.

    (a) Dr. Alberg described Rick's case as "uniquely close" (App. 534, R. Doc.88, at 186).

    (b) Dr. Sweet described case as "extremely close" (App. 784, R. Doc.86, at 91).

    (c) Dr. Alsdurf testified it was a close case "absolutely" (App. 558, R. Doc. 88, at 210).

2. Recantations by expert court examiners is extremely rare.

Appellate Case: 23-2359     Page: 23     Date Filed: 09/29/2023 Entry ID: 5321070

(a) Despite years of experience, Dr. Alberg testified that apart from this case he has never changed his opinion regarding a commitment recommendation (App. 530, R. Doc. 88, at 182)

(b) Dr. Hoberman has never seen another case where a court evaluator changed his opinion. (App. 680, R. Doc. 89, at 119).

3. Commitments in cases where court evaluators do not support commitment are very rare.

(a) Drs. Sweet and Alberg both testified that they have never been involved in a case that resulted in commitment after two court appointed examiners counseled against commitment. (R. Doc. 125, at 23, Add. 023).

(b) Dr. Alsdurf testified "I had several cases where the first examiner has said no, and I have been retained and I said no as well, and then we're done. So that's by far what happens" (App. 559, R. Doc. 88, at 211).

4. At the time of Rick's arrest in 1993, Rick was released on bail and did not reoffend, nor did he violate any of the terms of his release. (Pet. Exh. 1 at 4 ¶ 14).

5. Penny Zwecker, the Minnesota DOC Civil Commitment Review Coordinator did not recommend Rick for civil commitment. The state trial court accorded her testimony "great weight" (Pet. Exh. 1 at 10 ¶ 30).

6. Court evaluator Dr. Sweet noted it was very unusual for a commitment proceeding to be brought where the DOC did not recommend a commitment referral. In fact, he could recall no other case where this had occurred (App. 710-711, R. Doc. 86, at 17-18).

7. In 2004, both court evaluators demonstrated great reluctance in concluding that Rick met the SDP criteria:

    (a) Dr. Alberg - "he ***probably*** does meet the criteria to be considered a sexually dangerous person (emphasis added). And "***I do not believe that Mr. Rick meets the criteria to be considered a danger to the public as a result of his sexual behavior***" (Pet. Exh. 3 at 8, 11) (emphasis added).

    (b) Dr. Sweet – "Mr. Rick ***could be considered* to meet the overly broad criteria for commitment** as a SDP (Pet. Exh. 5 at 27) (emphasis added). And Dr. Sweet, referencing his prior testimony at the time of the State court trial: "I'm not sure what else an inpatient program would frankly do for [Rick]. I wouldn't be necessarily saying that if I considered him to be a higher risk of re-offending. (App. 736, R. Doc. 86, at 43)

8. In 2004 *four* community treatment programs were willing to accept Rick into their treatment program (Transition Place (Pet. Exh. 1 at 8 ¶ 26); Project Pathfinder (Exh. 1 at 10 ¶ 29); University of MN Program in Human

18

Sexuality (Pet. Exh. 2 at ¶ 17); 180 Degrees half way house (Pet. Exh. 2 at 7 ¶ 28)).

9. Neither court evaluator nor the trial court used the term "highly likely" in describing Rick's likelihood to reoffend.

10. The court evaluators in this case historically recommended that their subjects be committed the vast majority of the time. (Dr. Alberg - 75% (App. 532, R. Doc. 88, at 184); Dr. Sweet - 4 out of every 5 cases (App. 783, R. Doc. 86, at 90).

The foregoing selections demonstrate that this is clearly both a close and extraordinary case. On a personal level, surely reversing an opinion that Rick should be committed was a difficult thing for these court evaluators to do, both personally and professionally.

This case presents the ideal fact pattern for this court to extend the actual innocence/miscarriage of justice exception to civil commitments. Rick urges this court to affirm the district court and uphold the application of the actual innocence/fundamental miscarriage of justice exception to this civil commitment case.

19

## II. THE COURT SHOULD AFFIRM THE CONCLUSION OF THE DISTRICT COURT THAT IN LIGHT OF NEW RELIABLE EVIDENCE IT IS MORE LIKELY THAN NOT THAT NO REASONABLE JURIST WOULD HAVE ORDERED RICK'S CIVIL COMMITMENT

### A. Standard of Review and Applicable Law

As the district court notes in its analysis, the court has broad latitude in both how it determines reliability and its ultimate reliability determination (*see* discussion at R. Doc. 125 at 10-12, Add. 010-012, citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142, 119 S. Ct. 1167;143 L.Ed.2d 238 (1998). The County argues, instead, that the evidence is insufficient (i.e., not exculpatory) to meet the actual innocence gateway standard. Accordingly, this section will focus on the nature and sufficiency of Rick's evidence.

The County asserts that Rick must prove he is "actually innocent" of the contested element – whether Rick is highly likely to reoffend (Cty. Brief p. 30). In civil commitments, however, the question is not whether the person is innocent. The question is whether the person is a danger to the public, i.e., highly likely to commit a sex crime in the future. Accordingly, the apt consideration when determining whether this exception applies must be whether reliable new evidence demonstrates that the *key* evidence produced at trial has been so undermined that, had the new evidence had been available at Rick's 2004 trial, it is more likely than not that no reasonable jurist would have concluded that Rick met the SDP criteria.

20

This is the identical standard which is applied to the issue of whether a reasonable juror would have voted to convict in the criminal context.

It is noteworthy that even in the criminal context, actual "innocence" is never established. Rather, innocence means that guilt has not been proven beyond a reasonable doubt. Similarly, in the civil commitment context, the element of dangerousness to the public means that it has not been proven by clear and convincing evidence that the person presents a danger to the public. In both circumstances, the standard necessary for the exception to apply is more exacting in that it must be proven that it is more likely than not that *no* reasonable juror/jurist would find the person guilty/dangerous. On the other hand, the standard does not require absolute certainty – it must simply be "more likely than not" that no reasonable jurist would find the person highly likely to reoffend.

The key in both criminal and civil arenas is whether the new evidence is so strong that a court cannot have confidence in the outcome of the trial (*McQuiggin v. Perkins*, 569 U.S. 383 at 401 (2013). In both cases, that key decision is made by a judge. Rick submits this same standard and analysis can and should be adopted by this court as the gateway to the actual innocence/miscarriage of justice exception in civil commitments. Indeed, both the magistrate judge and the district court judge did so in this case. In fact, having a jurist determine what a reasonable

21

jurist would do may actually yield a more reliable result than requiring a jurist to anticipate what a reasonable juror would do.

In its brief, the County correctly recites the law applicable to this exception on pages 30-32. Likewise, the district court correctly summarizes those same legal principles which guided the court's analysis in this case (R. Doc. 125 at 9, Add. 009). The County does not argue that the district court's interpretation and application of the law was incorrect. The County simply disagrees with the district court's conclusion.

The district court's function is to assess the *likely* impact of the new evidence on a reasonable jurist in light of all the evidence in the case (*House v. Bell,* 547 U.S. 518, 522, 547, 126 S. Ct 2064, 2068, 2077 (2006). As the standard itself suggests (*i.e.*, "more likely than not"), assessing the likely impact does not require absolute certainty. (*Id*. 537-38).

In reviewing the decision of the district court, this court reviews the legal conclusions of the District Court *de novo*. (*Unites States v. Chapell*, 779 F.3d 872 (8th Cir. 2015). However, the district court's findings of fact are reviewed for "clear error" (*see* FRCP 52(a); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985), noting the court will overturn such findings only if, "on the entire evidence," we are "left with the definite and firm conviction that a mistake has been committed" *United States v.*

Appellate Case: 23-2359    Page: 29    Date Filed: 09/29/2023 Entry ID: 5321070

*United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746

(1948). "If there are two reasonable views of the evidence, the district court's

decision to accept one rather than the other cannot be clearly erroneous, and we

may not overturn findings of fact merely because we take a different view of the

evidence" (*see Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.*, 190

F.3d 64, 67 (2d Cir. 1999). Rick submits there was no clear error in the findings of

either the magistrate judge nor the district court judge in this case. Even if another

view of the evidence is possible, the view determined by the district court cannot

be overturned.

**B.** **The District Court Properly Concluded That New Reliable Evidence Established that The Most Significant Evidence That Led To Rick's Commitment Was Fundamentally Flawed, Which Rendered His Commitment Proceeding Fundamentally Unfair.**

In *House* the Supreme Court stated that "a habeas court must act as a fact

finder in determining whether the new evidence presented is reliable (*House*, 126

S. Ct. at 2088, citing *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995)

(Roberts C.J. concurring in part and dissenting in part). Consideration of reliability,

in turn, requires an assessment of the weight and probative force to assign the new

evidence in light of the evidence adduced at trial (*House*, 126 S. Ct. at 2089).

In the County's brief at pages 34-35 it references the *Linehan* case which

requires Minnesota courts to consider several factors in civil commitment cases "if

23

such evidence is presented", citing *In re Linehan (Linehan I)*, 518.N.W.2d 609, 614 (Minn.1994). At pages 36 and 37 of its brief the County goes on to list a number of additional factors which the State court considered. The County concludes that the State court did conduct a multi-factor analysis as required, "and did so correctly". (Cty. Brief p. 36). The County then argues that this requirement to consider multiple factors "limits the impact of Rick's 'new evidence' and makes his argument more akin to one of legal insufficiency". (Cty. Brief p. 37).

Rick agrees that the State court considered multiple factors as evidenced by 33 paragraphs of fact findings in its Order of July 21, 2004 and an additional 33 paragraphs of fact findings in its June 26, 2006 order (Pet. Exh. 1 at 1-13; Pet. Exh. 2 at 1-9).

However, ***the County mistakenly conflates consideration with weight***. There is no requirement in Minnesota law that the state court give weight to any one factor or group of factors, nor to *any* specific actuarial testing tool.

Notably, the State court in Rick's case took note of the potential for courts to be overbroad with interpretation of the statute, such that a court could find the statute to apply to everyone guilty of sexual misconduct or with strong sexual tendencies." (Pet. Exh.1 at 16, citing *In the Matter of Monson*, 478 N.S.2d 785, 788 (Minn. Ct. App 1991)). Accordingly, it is especially important for the state

24

court in each case to **isolate the most important factors**, as the Minnesota Supreme Court decision in *Ince* requires *(In re Ince*, 847 N.W.2d 13 (Minn. 2014). In *Ince* the court opined as follows:

> "**With the benefit of all the relevant and reliable evidence, the district court must make a good faith attempt to isolate the most important factors in predicting harmful sexual conduct. As the trier of fact, the district court will be in the best position to determine the weight to be attributed to each factor, as well as to evaluate the credibility of witnesses—a *critica*l *function* in these cases that rely so heavily on the opinions of experts.**" (*Id*. at 23-24) (emphasis added)

The State court in Rick's case did exactly as prescribed by *Ince*. It its July 2004 Findings, Conclusions and Order the State court summarized the relevant evidence in its findings of fact, and then in its memorandum succinctly isolated the most important factors as follows: "***Respondent's moderate risk of recidivism combined with not completing sex offender treatment . . . demonstrates that Petitioner has proved by clear and convincing evidence that there is a likelihood of Respondent reoffending"*** (Pet. Exh. 1 at 17) (emphasis added).

In addition to the mandate to isolate the most important factors in each individual case, the court in *Ince* cautioned the trial courts to be wary of the potential factor repetition that can result from considering the *Linehan* factors in addition to considering separately the same or similar factors found in the actuarials used in the same case (*Ince*, 847 N.W.2d at 24). Factor repetition leads to giving unwarranted additional weight to that factor. In her testimony, Dr. Phenix

25

labeled this practice "double dipping" and she confirms that if the factor is assessed in the actuarial, it should not be assessed again outside of the actuarial. (App. 397, l. 15-18, R. Doc.88, at 49).

At page 36 of its brief, the County urges this court to give unwarranted additional weight to individual historical/static factors which were not isolated by the State court and which are already assessed in the actuarial tools, e.g., victimization of more than one juvenile age group (*See* description of the HCR-20 which includes 20 historical items (Pet. Exh. 3 at 10-11) and the Static 99 which includes ten static variables. (Pet. Exh. 3 at 10).

Similarly at page 37 of its brief the County attempts to give unwarranted additional weight to individual factors which are already considered in the assessment of the impact of sex offender treatment on recidivism, e.g., lacking better insight on a more detailed and realistic relapse prevention plan.

The State court aptly notes that all of these historical factors pertaining to Rick's offending have been well known "since 1993" (Pet. Exh.1 at 6 ¶ 19). Moreover all of these historical factors, as well as all of the factors associated with Rick's sex offender treatment were explored in detail in the 2004 reports and testimony of all three evaluators. *See e.g.* (Pet. Exh. 3, Pet. Exh. 5, & Pet. Exh. 9).

Having considered all of these multiple factors, the State court in Rick's case was clearly in the best position to determine the weight to be attributed to each

26

factor and to isolate the most important factors. That is what the State court did. To give additional unwarranted weight to individual factors not specifically isolated by the State court as the most important, as the County invites this court to do, is to engage in the "double dipping" and "factor repetition" that the court in *Ince* warned about. This court should decline the County's invitation.

The County argues that actuarial and base-rate data cannot predominate over other factors (Cty. Brief p. 36 N.17, citing *In the Matter of Pirkl*, 531 N.W. 2d 902, 909 (Minn. 1995). Once again, this assertion is directly contradicted by *Ince*, which *requires* the trial court to make the determination ***in each case*** as to which factors predominate. Once the State court has isolated the most important factors in a given case, among the multiple factors it has considered, that decision is by statute *presumed* to be correct, which presumption can only be rebutted by clear and convincing evidence (28 U.S.C. § 2254 (e)(1)).

Although Minnesota courts do not mandate that actuarial test results predominate over other factors, it is also true that if, as in Rick's case, the State court isolates the actuarial results as one of the most important factors in predicting future recidivism in the case before it, then the Minnesota Supreme Court says it is ***critical*** that the isolated factors predominate over other factors not specifically isolated by the court. (*Ince*, 847 N.W.2d at 23-24)

Appellate Case: 23-2359    Page: 34    Date Filed: 09/29/2023 Entry ID: 5321070

The new evidence in this case undermines both of the factors identified by the State court as the most important in reaching its conclusion that Rick met the SDP criteria (i.e., Rick's moderate risk to reoffend based on the actuarials and his withdrawal from treatment). The examination of this new evidence by the two court appointed evaluators led both to recant their earlier testimony that Rick met the criteria as a SDP.

It bears repeating that the factors isolated by the State court were also the main focus of the three evaluators at Rick's commitment trial. All three spent considerable time in their reports referencing the actuarial tools that were used in Rick's case.

Likewise, all three evaluators addressed at length Rick's participation in treatment while in prison (*See e.g.* the report of Dr. Sweet wherein he devotes approximately 8 pages to the issue of Rick's treatment participation. (Pet. Exh. 5 at 9-16). The County's hired expert, Dr. Alsdurf, also stressed the importance of the treatment component in reaching his conclusion that Rick met the SDP criteria. In its findings, the state trial court, quoting Dr. Alsdurf, found "***that if Respondent had completed his sex offender treatment program at Lino Lakes Correctional Facility Respondent most likely would not be before the Court on this commitment proceeding***" (Pet. Exh. 2 at 8 ¶ 31) (emphasis added). The trial court then confirmed that "***based on Dr. Alsdurf's experience in the commitment***

28

*process of sex offenders, his opinion regarding what would likely have happened*

*to the Respondent had he completed sex offender treatment at Lino Lakes is*

*accurate"* (Pet. Exh. 2 at 8 ¶ 31) (emphasis added).

Given the emphasis on these two factors by the evaluators, it is not surprising that these two factors were isolated by the State court. (Note, e.g. the treatment factor is referenced in seven in the State court's 2004 findings (Pet. Exh. 1 ¶¶ 17, 18, 19, 20, 21, 24, & 33).

The County argues that Rick's evidence reflects just a difference of opinion regarding the new evidence, which is not enough "on its own" to meet the threshold for the reliability standard (*see* Cty. Brief p.37, Citing *Gimenez v. Ochoa*, 821 F. 3d 1136, 1143 (9th Cir. 2016). The County argues that the new recidivism evidence merely "continues the discussion on recidivism rates . . ." (App. Brief p. 38). The County mischaracterizes the evidence.

Referencing the 2012 study (Resp. Exh. 17) Dr. Phenix analyzes the impact of the decline in recidivism rates in the years leading up to the time of Rick's trial in 2004. (*See* Pet. Exh. 7 at 4-5). Dr. Phenix notes that the MnSOST-R actuarial used by Dr. Sweet in Rick's case presumed a six-year sexual recidivism *base rate* of 23% for the full normative sample of offender (sexual recidivism being defined as a formal charge). The determination of this base rate was based on "exhaustive

samples of incarcerated sexual offenders released from the MnDOC in 1988, 1990, and 1992" (*Id*. at 4). Based on that 23% base rate, a moderate risk offender was expected to have a six-year recidivism rate of 25%, just slightly above the 23% base rate. Dr. Phenix notes that "***moderate risk offenders recidivate at or near the base rate***" (*Id*. at 5) (emphasis added).

Referencing the 2012 study, Dr. Phenix notes that contemporary research available *after* Rick's trial found that in Minnesota "the four-year sexual *reconviction* rates dropped from 12.3% for sexual offenders released in 1992 to 3% for sexual offenders released between 2003 and 2006. This represented a 76% decline in four-year sexual reconviction rates over a span of about twelve years. She then extrapolated assuming a comparable 76% drop in the six-year sexual *charge* rates for offenders released between 2003 and 2006 (the time period when Rick was released) and concluded that a *moderate* risk offender such as Rick would be expected to recidivate at about a 6% rate (recidivism defined as a new sexual offense *charge*) rather than the 25% rate suggested by the norms used at the time of Rick's trial.

Given that moderate risk offenders recidivate at or near the base rate, Dr. Phenix concluded that at the time of Rick's commitment trial his expected rate of recidivism in 2004 as a moderate risk offender would have been about 6%, as

opposed to 25% suggested by the norms used at the time of Rick's trial. A 6%

recidivism rate is **half of what was considered a low-risk offender in 2004.** (*See*

Pet. Exh. 7 at 4 where Dr. Phenix notes that under the old norms low risk offenders

had a six-year sexual recidivism rate of 12%). Dr. Phenix confirmed that all of the

other actuarial tools used at the time of Rick's commitment "faced the same

conundrum" and similarly inflated the probability of sexual recidivism. (Pet.

Exh. 7 at 5).

The district court affirmed the opinion of the magistrate judge that the report

and testimony of Dr. Phenix were "very credible" (R. Doc.125, at 19, Add. 019).

This is a credibility determination to which this court must defer absent a finding

of clear error. (*Nooner v. Hobbs*, 689 F.3d 921, 933 (8th Cir. 2012).

The county challenged Dr. Phenix' s analysis, noting that her extrapolation

involved comparing *arrest* data with *reconviction* data. The district court addressed

this issue, noting that the 2007 study found that "by 2002 the recidivism rate for

sex offenders rearrested was 3.8%, and the reconviction rate was 3%. (Pet. Exh. 21

at 20-21) The district court found that for purposes of Rick's claim, the .8%

difference between the arrest and conviction rates is minimal." (R. Doc. 125 at 20,

Add. 020). This conclusion of the district court is sound, given that the reported

recidivism rates for both groups is extremely low.

31

The County challenges the studies relied upon by Dr. Phenix, claiming each study has "significant deficiencies" (Cty. Brief p. 39). The District Court specifically addresses this argument (*see* R. Doc. 125 at 13-16, Add. 013-016). In summary, the District Court concluded as follows:

1. Both studies were written by recognized Minnesota DOC researchers and published in a per-reviewed academic journal.

2. Although the 2012 study was not specifically a sexual recidivism study, all the experts who testified at the evidentiary hearing agreed that the sex offender recidivism rates had dropped significantly in the years immediately prior to 2004 when Rick's commitment trial occurred. This conclusion is generally accepted in the field (R. Doc. 125 at 15, Add. 015). The court found the 2012 study to be reliable (R. Doc. 125 at 17, Add. 017).

3. It was the consensus among the forensic psychologists in 2004 that people who refused or dropped out of treatment would be more likely to reoffend (R. Doc. 125 at 16, Add. 016).

4. The District Court found that the 2009 study which concluded that offenders who dropped out of treatment did not significantly increase the risk of recidivism was reliable.

Appellate Case: 23-2359    Page: 39    Date Filed: 09/29/2023 Entry ID: 5321070

Despite the objection by the County to the methodology used in the 2009 and 2012 studies, it has not offered any evidence that any of the underlying facts reported in those studies regarding recidivism rates and impact of withdrawal from treatment are flawed or inaccurate. In fact, the district court noted that all of the experts who testified at the evidentiary hearing agreed that the recidivism rates had declined before Rick's commitment trial (R. Doc. 125 at 10, Add. 010). The district court correctly determined that those studies credibly supported the data upon which Dr. Phenix and the recanting court evaluators relied.

The County argues that Rick's claim in this case is one of legal insufficiency of the evidence, which claim the County notes was addressed and rejected by the Minnesota court of appeals (Cty. Brief p. 37). Rick's appeal to the Minnesota court of appeals has no relevance to this case. There was no attempt by the Minnesota court of appeals to identify or give deference to the factors isolated by the state trial court as most significant, nor did the Minnesota court of appeals have before it the issue of flawed evidence and the recantations of two court evaluators. Rick's appeal to the Minnesota court of appeals was in fact a legal insufficiency case. On the contrary, Rick's habeas case is about a commitment trial that, based on new reliable evidence, was fundamentally and constitutionally flawed.

Given that the result of all the actuarial tools in Rick's case placed him in the moderate category of likelihood to reoffend, the trial court was dependent upon the

33

clinical judgment of the expert examiners to elevate Rick's risk to the "highly likely" standard. There was wide disparity between the experts at the evidentiary hearing as to the reliability of clinical judgments.

On the one hand, Dr. Phenix testified that clinical judgment has been thoroughly studied and has been determined to be "no better than a coin flip" in predicting recidivism (App. 367-369, R. Doc. 88, at 19-21). Therefore whenever possible she avoids the use of clinical judgment to override the results yielded by actuarial tools. On the other hand, in the opinion of Dr. Hoberman the assessment of risk to reoffend "all comes down to professional clinical judgment". In fact, he testified that he is not sure actuarial tools should even be used. (App. 647, R. Doc. 89, at 86).

The State court is assigned the ultimate task of deciding what weight to accord to the evidence – a difficult task given the great disparity between the experts as to what weight should be given to the evidence. Accordingly, as per the directive in the *Ince* case as set forth in detail above, it is essential that every case be evaluated by the trial court on its own merits, and great deference must be given to what weight, if any, the trial court assigns to the evidence. (*Ince*, 847 N.W.2d at 23-24).

34

The State court's ruling isolates Rick's moderate risk of reoffending, based on actuarial testing used by the experts, and Rick's withdrawal from treatment, which was also the central focus of all three evaluators. These two factors, in turn, were precisely the focus of Drs. Sweet and Alberg in recanting their prior opinions that Rick met the criteria as a SDP. (*See* Pet. Exh. 4 & 6). The district court it its analysis of this habeas case correctly maintained that same focus on these two factors in assessing whether Rick's trial had been rendered fundamentally unfair resulting in a violation of his right to due process (R. Doc. 125 at 3, 30-32, Add. 003 & 030-032).

It is when the evidence supporting those most important factors, as identified by the State court, is significantly undermined that access to the actual innocence exception arises. The district court in this case considered the entire record, but also correctly kept its focus on the most important factors isolated by the State court. In doing so, the district court concluded that there was exculpatory evidence such that it "rendered [Rick's] commitment proceeding fundamentally unfair". Given the deference accorded to the district court regarding its assessment of the weight and credibility of the evidence, Rick's case for application of this exception is not diminished because another court might have weighed the evidence differently. (*Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.* 190 F.3d 64, 67 (2d Cir. 1999). Rick submits there is no clear error which would allow

35

this court to overturn any of the factual or credibility findings of the district court in this case.

The County argues that the proffered new evidence is not "truly exonerating evidence" (Cty. Brief p. 38). In support of its argument the County submits that the 2019 reports and 2021 testimony of Drs. Sweet and Alberg are "modified testimony" that does not amount to a recantation. The magistrate judge specifically addressed this issue in its R&R of 5/19/2022 (R. Doc. 94 at 18-19, Add. 050-051), finding that these two examiners did in fact recant their 2004 opinions (citing *Santos v. Thomas*, 779 F.3d 1021, 1026 (9th Cir. 2015) holding that statements were recantations when they "***directly contradicted or otherwise challenged witnesses' own initial statements***" (emphasis added)). (*See also Amrine v. Bowersox*, 238 F.3d 1023, 1028-29 (8th Cir. 2001) holding that recanted testimony is new evidence). Likewise, the district court found that both court examiners' opinions to be recanted (R. Doc. 125 at 31, Add. 031, citing *Lewis v. Erickson*, 946 F.2d 1361, 1362 (8th Cir. 1991)) where the court notes, "Recanted testimony . . . is grounds for relief from a conviction when it either bears on a witness's credibility or directly on the defendant's guilt.")

The conclusion of the district court that both court evaluators in this case recanted is clearly correct. Both reversed their opinions on the ultimate issue

36

whether Rick met the criteria as a SDP, which was a clear challenge to their initial conclusion, and which obviously bears directly on whether Rick would be confined for an indeterminate period of time. These recantations are new evidence and are crucial to Rick's passage through the actual innocence gateway.

In assessing the credibility and reliability of the recantations of both court evaluators, the district court took into consideration that both evaluators testified at the evidentiary hearing and were cross examined on several other factors each had considered in reaching their initial opinions, as well as their revised opinions (R. Doc. 125 at 28, Add. 028, referencing App.507-513, R. Doc. 88, at 159-165; App.754-756, R. Doc.86, at 61-63). The district court found court evaluator Dr. Alberg's testimony "highly credible and persuasive". (R. Doc. 125 at 22, Add. 022) The district court also found court evaluator Dr. Sweet's testimony credible. (R. Doc. 125 at 24, Add. 024).

Likewise, all of the evaluators in Rick's trial presumed that withdrawal from treatment would significantly increase the likelihood that Rick would reoffend. This was clearly the consensus of experts in the field at that time. (R. Doc. 125 at 16, Add. 016). Dr. Phenix reported that in 2004 Dr. Sweet correctly cited a 1998 article by Hanson which concluded that failure to complete treatment was one of the three strongest factors associated with higher levels of sexual recidivism (Pet.

37

Exh. 7 at 7; *see also* Pet. Exh. 5 at 26). In Dr. Sweet's reference to the Hanson article, he noted that the Hanson study analyzed the results of 61 studies, involving a total of 23,393 subjects).

That withdrawal from treatment was presumed to be a significant indicator of sexual recidivism is evidence by the fact that a great deal of time and attention was devoted to this issue by all three evaluators at Rick's trial (*see e.g.* Dr. Sweet's report where more than 8 pages is devoted to Rick's prison treatment history (*see* Pet. Exh. 5 at 9-17). As noted earlier in this brief, the State court references the treatment issue in 7 of its 2004 findings of fact.

The 2009 study, which the district found reliable, substantially debunked the notion that withdrawing from treatment significantly increased the risk of recidivism. Dr. Phenix summarizes the results of that study on page 8 of her report as follows: "…the authors found a modest positive effect for treatment completion, and ***treatment dropout had no negative effect on sexual recidivism*** . . ." (Pet. Exh. 7) (emphasis added). The chart on page 8 of her report shows that "any time after release" the difference in recidivism rates between treatment dropouts and treatment completers is only about 3 percent. None of the experts who testified at the evidentiary hearing produced any evidence that the statistical rates of recidivism reported in this study were inaccurate.

38

Contrary to the County's assertion, the new evidence proffered by Rick in this case is strongly exculpatory, summarized as follows:

1. A 76% decline in the recidivism rates that were in effect but unknown and unavailable to the experts in 2004, and which undermined all of the actuarial tools used in Rick's case, such that they significantly overstated Rick's likelihood to reoffend.

2. Evidence from a Minnesota study which showed that by the time of Rick's commitment trial in 2004 withdrawal from treatment had no significant impact on his likelihood to reoffend, even well into the future.

3. Both court appointed evaluators in Rick's case, upon reviewing the new evidence, made the rare and difficult decision to reverse their conclusion that in 2004 Rick met the criteria as a SDP.

The district court correctly determined that based on the cumulative weight of this exculpatory evidence, it is more likely than not that no reasonable jurist would have found by clear and convincing evidence that Rick met the standard for commitment. (R. Doc. 125 at 32, Add. 032).

Appellate Case: 23-2359    Page: 46    Date Filed: 09/29/2023 Entry ID: 5321070

Rick urges this court to affirm the conclusion of the district court that the standard to pass through the gateway to a consideration of the merits of Rick's constitutional due process claim in this case has been met.

## III. THE COURT SHOULD AFFIRM THE DISTRICT COURT'S CONCLUSION THAT THERE WAS A VIOLATION OF RICK'S DUE PROCESS RIGHTS.

### A. Standard of Review and Applicable Law

The parties do not dispute the law applicable to the consideration of whether Rick has shown a due process violation occurred in connection with his 2004 commitment trial. Rick must show that the alleged improprieties were so egregious that they rendered his commitment trial fundamentally unfair, and therefore a miscarriage of justice (*Rousan v. Roper*, 436 F.3d 951 (8th Cir. 2006).

Rick's commitment in his 2004 trial required that there be clear and convincing proof that he was highly likely to commit a sex crime in the future. The United States Supreme Court has long held that no one can be deprived of liberty by means of a civil commitment proceeding unless it is proven by clear and convincing evidence that the person poses a danger to the public. This is a fundamental constitutional right protected by the due process clause in the 14th amendment (*Foucha v. Louisiana*, 504 U.S. 71, 86, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992)).

As the court in *Foucha* noted, "It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." (*Id*. at 86. Citing *Jones v. United States*, 463 U.S. 354, 361, 103 S. Ct. 3043, 77 L. Ed 2d 694 (1983)). Due process in the civil commitment context *requires* that confinement be limited to those who suffer from a volitional impairment rendering them *dangerous beyond their control* (*Kansas v. Hendricks*, 521 U.S. 346, 358, 117 S. Ct. 2072, 138 L. Ed. 2d. 501 (1997) upholding the Kansas civil commitment act because it "unambiguously requires a finding of dangerousness either to one's self or to others as a prerequisite to involuntary confinement"—*Id*. at 357).

Clear and convincing proof of dangerousness, therefore, is a bright line due process constitutional standard that must be met in every civil commitment case. Put simply, if the evidence of dangerousness has been substantially undermined by new reliable evidence, so as to render the commitment proceeding fundamentally unfair, the constitutional due process violation has been established. That is what both the magistrate judge and the district court rightly concluded in this case (R. Doc. 125 at 31-32, Add. 031-032; R. Doc. 94 at 45-47, Add. 077-079). Simply put, the commitment and resulting confinement of a person who is not "dangerous" violates the due process clause of the constitution. States have no power to commit non-dangerous individuals.

41

**B. This Court Should Affirm the Conclusion of the District Court that Rick Has Established a Constitutional Violation of His Right To Due Process.**

The evidence in Rick's commitment trial that he posed a danger to the public was precariously thin, as evidenced by the following:

1. All three evaluators at Rick's trial agreed that Rick did not meet the criteria as a Sexual Psychopathic Personality.

2. At the conclusion of his prison sentence Rick was not recommended for commitment by the Minnesota Department of Corrections (Pet. Exh. 1 at 1-2 ¶ 3).

3. With the exception of Dr. Alsdurf, the examiner hired by the County, all experts who testified at Rick's commitment trial, including both court-appointed examiners, concluded that Rick could be safely treated in an *outpatien*t program in the community (Pet. Exh. 1 at 18; Pet. Exh. 2 at 8 ¶¶ 32 & 33).

4. Despite the "highly likely" standard being in place in Minnesota at the time of Rick's commitment trial, the court summarized that "Petitioner has proved by clear and convincing evidence that there is *a likelihood* of Respondent reoffending" (Pet. Exh. 1 at 17) (emphasis added).

42

5. The state trial court also concluded that Rick established *by clear and convincing evidence* that he could be treated in an outpatient treatment program (Pet. Exh. 2 at 9 ¶ 2).

6. *Four* community treatment providers agreed to accept Rick in their program. Project Pathfinder (rejected only due to social and political pressure— Pet. Exh. 2 at 2 ¶ 10); Transition Place (Pet. Exh. 1 at 8 ¶26); 180 Degrees Halfway House (Pet. Exh. 2 at 7), University of Minnesota Program in Human Sexuality (Pet. Exh. 2 at 4 ¶17).

7. Dr. Alberg opined in his 2004 report that "In consideration of all of the above, I do not believe that Mr. Rick meets the criteria to be considered a danger to the public as a result of his sexual behavior" (Pet. Exh. 3 at 9).

8. Only Dr. Alsdurf, the evaluator hired by the County, concluded at the 2004 commitment trial that Rick needed to be confined in the MSOP. He maintained that position at the evidentiary hearing, despite the new evidence which he found "interesting" and "helpful", but did not explain why he did not find the new evidence to be persuasive (R. Doc. 125 at 25, Add. 025). However, the magistrate judge found his testimony at the evidentiary hearing to be "less credible" and "less persuasive" (R. Doc. 94 at 20, Add. 052); this credibility assessment was confirmed by district court at R. Doc. 125 at 25, Add. 025.

43

The new exculpatory evidence must be considered in light of the already weak case that Rick posed a danger to the public. The district court in this case has found credible the evidence that the actuarials in Rick's case significantly overestimated Rick's probability to reoffend, and that there was undue emphasis placed on Rick's withdrawal from treatment (R. Doc. 125 at 19-22, Add. 019-022). Rick submits that the already weak case for dangerousness, coupled with the undermining of the most prominent evidence used at trial to establish dangerousness, as identified by the state trial court, clearly establishes that it is more likely than not that no reasonable jurist would find that Rick was highly likely to reoffend, an essential element required to be committed as a SDP.

The County appears to argue that a due process violation depends upon all parties agreeing that the underlying evidence is flawed, citing *Lee v. Houtzdale*, 798 F.3d 159, 167, 169 (3d Cir. 2015), and *Souliotes v. Hedgpeth*, No. 1:06-cv-00667 AWI/MJS HC 2012 WL 1458087 (ED Calif. Apr. 26, 2012). The cases cited by the County do not support this claim. The court in both cited cases found that *proof of flawed scientific evidence was indeed exculpatory and provided a basis for a finding a due process violation* (*Lee*, 798 F.3d at 165). The standard for this exception, as correctly applied by the district court in Rick's case, requires that the exculpatory evidence be *reliable*. The fact that the experts were in agreement in *Lee* provided a basis for determining that the evidence was reliable. However

44

nowhere in either case cited by the County does the court suggest that agreement by all experts is essential to a determination of reliability.

Nor does the standard require, as the County suggests, that petitioner establish that the flawed evidence is "false". As Dr. Phenix noted, the actuarial tools used by the examiners at the 2004 commitment hearing were "appropriate for that period in time" (Pet. Exh. 7 at 6). Every application of this exception is by definition based on hindsight, the question being whether the new reliable evidence establishes that, *looking back*, the evidence upon which the person was committed was so flawed that it rendered the proceeding fundamentally unfair and therefore a violation of the person's right to due process. In Rick's case, both the district court and the magistrate judge expressed and applied that standard correctly, and determined that the standard has been met to apply the exception to Rick's case (R. Doc. 125 at 31-32, Add. 031-032 & R. Doc. 94 at 47, Add. 079).

The County also cites cases where courts have determined that habeas relief was denied based on a finding that the challenged testimony was not "plainly faulty" or that it established only "conflicting testimony" (App. Brief p. 42-43). The district court in this case specifically considered these cases, noting that the two court examiners, despite being cross examined on multiple factors, nevertheless confirmed their recantations. (R. Doc. 125 at 29, Add. 029; App 507-513, R. Doc. 88, at 159-165; App 754-756, R. Doc.86, at 61-63; App. 759, R. Doc.

45

86, at 66,). The district court found both court examiners to be credible (R. Doc. 125 at 22, 24, Add. 022 & 024).

The Second Circuit Court has opined that a recantation of material testimony violates due process if the recantation "would most likely affect the verdict" (*Sanders v. Sullivan* 863 F.2d 218, 224-225 (2d Cir. 1988)).

The opinions of the two court evaluators in 2004 that Rick met the criteria as a SDP were clearly material testimony. In their recantations, the two court evaluators identified specifically the two factors that the trial court found to be the most significant in making its SDP finding (1. the moderate level of risk determined by the actuarials and 2. Rick's withdrawal from treatment). Both evaluators concluded that the new evidence on those two key issues had significantly undermined the basis for their conclusion in 2004 that Rick met the criteria as a SDP. Both then opined, based on the new evidence, that Rick did ***not*** meet the criteria as a SDP in 2004.

Given that by all accounts this was a very close case in 2004, the district court correctly concluded that the new reliable evidence, including the recantations, rendered Rick's trial fundamentally unfair, thus establishing a clear due process violation (R. Doc. 125 at 32, Add. 032). Judge Schultz in his May 19, 2021 R&R noted that Minnesota courts rely heavily on expert opinions in civil commitment cases. (R. Doc. 94 at 46, Add. 078, citing *Ince*, 847 N.W.2d at 24).

46

In this case the key evidence isolated by State court has been determined to be significantly flawed, to the extent that two court appointed experts have now reversed their opinions and have concluded that Rick in 2004 did **not** meet the criteria as a SDP. The district court correctly concluded that the improprieties resulting from this new evidence are so egregious that they fatally infected the entire commitment proceeding and thus render the proceeding fundamentally unfair. On this basis, the district court found that it is more likely than not that no reasonable jurist would have found by clear and convincing evidence that Rick met the statutory criteria for commitment. (R. Doc. 125 at 32, Add. 032). Because the direct result of this flawed proceeding has been the confinement of Rick, a person who is not dangerous to the public, a due process violation has occurred.

Based on the foregoing, Rick respectfully requests that the district court's determination that Rick's 2004 trial resulted in a violation of Rick's right to due process be affirmed.

### C. The District Court Has No Authority To Devise Or Implement Or Supervise A Release Plan For Rick.

The County proposes in its conclusion that in the event that the district court's granting of the writ of habeas corpus is affirmed, the case be remanded to the district court to establish a release plan. (*See* Cty brief p. 47-48). The original order of the district court granting the writ included a 30 day stay to allow for

47

implementation of a release plan by the Minnesota Department of Corrections. (App. 950, R. Doc. 104, at 33)

However, pursuant to a motion brought by Rick, the district court amended its order to delete the requirement for a release plan, as Rick had completed his entire sentence, including any supervisory periods, and therefore the Minnesota DOC no longer had jurisdiction to revise, implement, or supervise a release plan (*See* R. Doc. No. 106, 1/16/2009 DOC letter attachment to Declaration of Lance R. Heisler & App. 963-965, R. Doc. 123, at 1-3)

The County offers no jurisdictional, statutory, or other legal basis for the district court to reverse its decision and implement a release plan. Further the County offers no practical or procedural basis on which the district court could, on its own, devise, implement, and supervise such a plan. This request by the County should be denied.

## CONCLUSION

As this case demonstrates, civil commitments require experts to make predictions about future dangerousness based on science and research which is continually evolving. Obviously, the advances in research in this field are not constrained by a statutory statute of limitations.

The district court in this case has demonstrated that the same standards and principles that apply to the actual innocence, fundamental miscarriage of justice

48

exception in the criminal context can be applied to civil commitments. In Rick's case, the most significant evidence supporting a prediction of future dangerousness has been substantially undermined in what was already a close case, such that the experts have reversed their opinions on the ultimate issue of whether Rick met the criteria as a SDP.

Habeas is at its core an equitable remedy. But for the Minnesota DOC refusal to provide funding for an outpatient program, Rick would have been in the community almost 20 years ago. Two experts instrumental in the court's decision to commit Rick say that based on new evidence Rick's commitment was a mistake and that he was not in fact a dangerous person. To confine Rick in 2004 was a violation of his right to due process. As a matter of equity and fundamental fairness, the actual innocence/fundamental miscarriage of justice exception should be applied in this case, and the Order of the district court should be affirmed.

Dated: September 28, 2023      Respectfully submitted,

HEISLER LAW OFFICE

/s/ Lance R. Heisler
Lance R. Heisler #043631
105 East 5th Street, Suite 205
Northfield, MN 55057
Phone: (507) 222-9062
lheisler@heislerlawoffice.com
ATTORNEY FOR APPELLEE

49

**CERTIFICATE OF COMPLIANCE**

1.　　This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 11,372 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32 (a)(7)(B)(iii).

2.　　This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using

Microsoft Word in size 14 Times New Roman font.

**VIRUS CHECK CERTIFICATION**

The electronic version of the Brief has been scanned for viruses and is

virus-free.

/s/ Lance R. Heisler
Lance R. Heisler

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2023, I electronically filed the foregoing Appellant's Brief and Appendix with the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Emily Beth Anderson
ATTORNEY GENERAL'S OFFICE
Suite 1400
445 Minnesota Street
Saint Paul, MN 55101-2127
(651) 296-9412

Elizabeth Beltaos
Matthew Hough
Brittany D. Lawonn
HENNEPIN COUNTY ATTORNEY'S OFFICE
Government Center, C-2000
300 S. Sixth Street
Minneapolis, MN 55487
(612) 348-5527

/s/ Lance R. Heisler
Lance R. Heisler
